UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 3:22-CR-170 |
| v. | : | (JUDGE MANNION) |
| KELVIN VAZQUEZ-PAGAN,   and   CARLOS PEREZ-RIVERA, | : | |
| | : | |
| Defendants | | |

## MEMORANDUM

Pending before the court are defendants Kelvin Vazquez-Pagan's and Carlos Perez-Rivera's motions to suppress evidence pursuant to Fed.R.Crim.P. 12(b). (Docs. 42 & 45). Defendants are charged with possession with intent to distribute Cocaine in excess of 500 grams. 21 U.S.C. §841(a)(1) and §841(b)(1)(B). The drug evidence was seized on March 23, 2022, after Pennsylvania State Police ("PSP") troopers executed a traffic stop for a cracked windshield, at approximately 8:30 a.m., on a silver in color Mitsubishi Galant ("Galant") vehicle driven by Vazquez-Pagan on Interstate 380 North in Lackawanna County, PA. While in the process of pulling over the defendants, PSP troopers followed the defendants with their lights on and activated their sirens on several occasions. The original PSP troopers in pursuit of the defendants required assistance from another patrol vehicle due to the failure of the defendants to pull over. After approximately

four miles, the defendants pulled over. Kelvin Vazquez-Pagan was the driver and Perez-Rivera was a front seat passenger in the vehicle. After the traffic stop and questioning, Vazquez-Pagan initially declined the request of the troopers to consent to a search of his vehicle, but shortly thereafter reviewed a consent form in Spanish and signed a written consent form granting permission for the troopers to search the vehicle. Vazquez-Pagan and Perez-Rivera were arrested when the troopers discovered cocaine during a search of the vehicle.

Defendants seek the court to suppress the drug evidence obtained from the vehicle alleging that it was obtained unlawfully under the 4th Amendment. Defendants contend that the evidence was obtained unlawfully since the troopers did not have reasonable suspicion to search Horsford's vehicle and that the troopers' questioning unconstitutionally prolonged the stop, in violation of their 4th Amendment rights.

For the reasons discussed below, after consideration of the briefs and the evidence submitted, including the audio/video dash-cam recordings of the defendants' traffic stop, the motions to suppress of both defendants will be **DENIED**.

I. PROCEDURAL BACKGROUND

Defendants Kelvin Vazquez-Pagan (hereinafter "Vazquez-Pagan"), and Carlos Perez-Rivera (hereinafter "Perez-Rivera"), were arrested at the scene of a traffic stop by PSP troopers on the morning of March 23, 2022,

after a search was consented to by the vehicle owner, Vazquez-Pagan. Both defendants were then detained in custody. On April 26, 2022, a federal grand jury returned a one-count indictment charging defendants with violations of 21 U.S.C. §841(a)(1), 21 U.S.C. §841(b)(1)(B), and 18 U.S.C. §2, possession with intent to distribute in excess of 500 grams of cocaine. (Doc. 1).

On May 9, 2022, Vazquez-Pagan appeared before Judge Saporito for arraignment, and he pled not guilty to the charges. (Doc. 20). On May 9, 2022, Perez-Rivera appeared before Judge Saporito for arraignment, and he also pled not guilty to the charges. (Doc. 15).

On September 13, 2022, Vazquez-Pagan filed, through his counsel, a motion to suppress evidence and a brief in support, as well as Exhibits including the "Mobile Video Recorder" ("MVR" or "dash-cam") video from Trooper Sterniak's patrol car. (Docs. 42-44). On September 19, 2022, Perez-Rivera filed, through his counsel, a motion to suppress evidence and brief in support. (Docs. 43). The motions to suppress of both defendants pertain to the suppression of the drug evidence seized from the traffic stop.

After being granted an extension of time, the government filed its opposition brief to both of the defendants' motions to suppress on October 7, 2022. (Doc. 51).

## II. FACTUAL BACKGROUND[1]

On March 23, 2022, at approximately 08:30 a.m., PSP Trooper Sterniak was in a marked patrol car that was stationary alongside the roadway, overlooking the north bound lane of Interstate 380 in Lackawanna County, Pennsylvania. Trooper Sterniak observed a silver in color Mitsubishi Galant drive by his stationary position going at a speed much slower than the posted speed limit of 70 m.p.h. Additionally, Trooper Sterniak observed that the vehicle had a "plain jane" appearance with no dealership markings, no license plate bracket, or personal markings, such as stickers or magnets. Trooper Sterniak explained that from training these "plain jane" type vehicles are commonly used by drug smugglers as a means to blend in with the general motoring public. (Doc. 43-3 p.2).

Trooper Sterniak began following the Galant after observing the very slow speed at which the vehicle was traveling. Upon nearing the Galant, Trooper Sterniak saw the vehicle had a windshield crack extending across the windshield at approximately driver eye level. (MVR 2:43). He also observed the vehicle had a newer registration plate out of New Jersey (the "NUL" series). Additionally, Trooper Derek Martin was traveling in the patrol car with Trooper Sterniak and stated that Vazquez-Pagan had a "death grip"

---

[1] The court notes that for present purposes it bases the factual background of this case on the briefs of the parties, the Exhibits, and the dash-cam video recording of the March 23, 2022 traffic stop. The court also notes that all of the times stated herein are approximate times based on the dash-cam video and are during the morning hours of March 23, 2022.

4

Case 3:22-cr-00170-MEM   Document 54   Filed 12/27/22   Page 5 of 19

on the steering wheel at 10 o'clock and 2 o'clock. (MVR 2:32). Trooper Sterniak conducted a query on the vehicle's registration (K16 NUL) and discovered the vehicle was registered out of Passaic, New Jersey. Due to the large crack in the windshield, Troopers Sterniak placed his vehicle in the right lane of travel behind the Galant and activated the emergency lights of the vehicle to initiate a traffic stop at approximately mile post 20.2. After the driver of the Galant did not pull over after a period of time, Trooper Sterniak activated the siren several times, but the driver still did not pull over. Trooper Sterniak called for assistance from a nearby PSP patrol vehicle. A civilian in a red vehicle even attempted to assist the PSP by pulling in front of the Galant and reducing his speed, but the Galant turned on his turn signal to change to the left lane of travel to move around the red vehicle. (MVR 5:14). Trooper Stepanski pulled alongside the Galant with his vehicle's lights and sirens activated. While in pursuit, Trooper Sterniak observed the occupants of the Galant "moving around a bunch." (MVR 6:10). Trooper Sterniak again followed the Galant into the left lane of travel with his emergency lights still activated. After changing lanes and passing the red vehicle, the Galant returned to the right lane with Trooper Sterniak still following behind. By this point, the second PSP patrol vehicle arrived operated by Trooper Stepanski. Once the second PSP vehicle pulled alongside the Galant, the driver finally pulled over at approximately mile mark 24.4. As the vehicle came to a stop, Trooper Sterniak noted the occupants were still making movements inside the vehicle.

The Troopers approached the vehicle carefully on the passenger side. The MVR reveals that Troopers Sterniak and Martin approached the vehicle on the passenger side and Trooper Martin can be seen with his hand on his holster. (MVR 6:33). The other two troopers approached the vehicle on the driver's side. (MVR 6:49). Trooper Sterniak spoke to the occupants through the passenger window and asked why they were shifting around so much inside the vehicle, but did not receive a response. Trooper Sterniak then asked the driver whether he had seen the emergency lights that had been activated behind him for several miles. The driver acknowledged he had seen the lights, but did not think the lights were meant for him. (MVR 6:49). Trooper Sterniak asked the driver for his license. The driver handed him a license which identified him as Kelvin Vazquez-Pagan, and Vazquez-Pagan confirmed the vehicle belonged to him. Trooper Sterniak then asked for the driver's proof of insurance and registration. While Vazquez-Pagan searched for these documents, the passenger asked if the troopers spoke Spanish. Trooper Sterniak responded that he spoke a little Spanish by stating "poco." The passenger stated he did not have any identification on him.

Trooper Sterniak asked Vazquez-Pagan to exit the vehicle and accompany him back to his patrol vehicle. While walking back to Trooper Sterniak's patrol vehicle, Trooper Sterniak again stated he was attempting to stop Vazquez-Pagan's vehicle for several miles. Additionally, Trooper Sterniak explained that the large crack in the windshield posed a safety issue and that Vazquez-Pagan needed to get it repaired.

Trooper Sterniak then asked for permission to "pat-down" Vazquez-Pagan for weapons because he was "a little uneasy when you don't pull over," and Vazquez-Pagan consented to the pat-down. (MVR 8:31). The pat-down revealed no weapons. Trooper Martin remained with the passenger who stayed inside the Galant.

At this point, Trooper Sterniak re-entered his patrol vehicle with Vazquez-Pagan standing at the passenger window. Trooper Sterniak confirmed that Vazquez-Pagan was coming from New Jersey. He then asked where Vazquez-Pagan was headed to, and Vazquez-Pagan replied, "Ithaca and Scranton and Syracuse." Trooper Sterniak asked, "What's going on in Syracuse?" Vazquez-Pagan explained that his sister resided in Syracuse, but then later clarified his sister actually lived in Ithaca. He also explained that he would be returning to New Jersey later that same day. Trooper Sterniak then asked who the passenger was to which Vazquez-Pagan replied that it was his friend. After being asked his friend's name, Vazquez-Pagan replied that his friend's name is "Carlos," but could not provide a last name. Vazquez-Pagan then again stated that he would be visiting his sister and returning home to New Jersey that same day.

During the conversation, Trooper Sterniak conducted a license check and criminal record check, which resulted in Vazquez-Pagan having a valid license and a negative criminal record.

Trooper Sterniak then instructed Vazquez-Pagan to remain near the patrol vehicle while he went to speak with the passenger. The passenger

7

confirmed he did not have any identification. Trooper Sterniak then asked the passenger if he could write his name on the trooper's notepad. The passenger provided that his name was "Carlos Perez-Rivera." Perez-Rivera confirmed that Vazquez-Pagan was a friend. Trooper Sterniak then asked Perez-Rivera where they were traveling to, which Perez-Rivera responded by stating, "New York, my family." He made a collection of statements saying that he was visiting "Syracuse" and going there for "two days." He also mentioned going there for "trabajar" or work.

At this point in time, Trooper Sterniak returned to his patrol vehicle and noted some differences in the stories between both defendants. Trooper Sterniak then asked Vazquez-Pagan if he had anything illegal in the vehicle to which Vazquez-Pagan replied there was nothing illegal in the vehicle. Trooper Sterniak asked for consent to search the vehicle and explained that Vazquez-Pagan did not need to approve the search. Trooper Sterniak informed Vazquez-Pagan that if he did not consent, then they would request the canine unit to detect around the exterior of the vehicle. Vazquez-Pagan was then given a "Consent to Search" form in the Spanish language, which he signed and returned to the troopers.[2]

After receiving the written consent to search the vehicle, Trooper Sterniak asked Perez-Rivera to exit the vehicle. Perez-Rivera also consented to a pat-down of his person and voluntarily removed several items

---

[2] The defendants do not challenge the validity of the consent form nor the search of the vehicle.

from his pockets: a bundle of U.S. currency and an opened package of "cigarillos" which smelled of marijuana. The pat-down did not reveal any weapons.

The troopers then began a search of the vehicle. Under the front passenger seat, the troopers discovered a wrapped kilogram of suspected cocaine. At his moment, Vazquez-Pagan and Perez-Rivera were placed in handcuffs. Next, a marijuana grinder was found in the vehicle. Then, inside the trunk of the vehicle, a decorative mirror was discovered to contain three additional kilograms of suspected cocaine. A field test was performed on the suspect cocaine and yielded a positive result for the presence of cocaine.

Both defendants were charged with state drug offenses, which were later adopted by the DEA for federal prosecution.

### III. LEGAL STANDARD FOR SUPPRESSION MOTION

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. Lange v. California, ––– U.S. –––, 141 S.Ct. 2011, 2017 (2021).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

9

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753-55 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Generally, a search "requires a warrant supported by probable cause." Carpenter v. United States, ––– U.S. –––, 138 S.Ct. 2206, 2213 (2018) (citing Smith v. Maryland, 442 U.S. 735, 740, (1979)). "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991) (internal quotations omitted). An affidavit in support of a search warrant "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists." United States v. Weaver, 99 F.3d 1372, 1377 (6th Cir. 1996).

"[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." Minnesota v.

Carter, 525 U.S. 83, 88 (1998). "[U]nder the reasonable expectation of privacy test, the Fourth Amendment protects against an unreasonable search of an area in which (1) a person exhibits actual, subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable." U.S. v. Ellis, 270 F.Supp.3d 1134, 1140 (N.D. Cal. 2017) (citing Katz v. United States, 389 U.S. 347, 361 (1967)). "Under Katz, the capacity to claim Fourth Amendment protection does not strictly depend on a property right in the invaded place, but whether the person asserting the claim has a legitimate expectation of privacy." Id. (citations omitted).

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" United States v. Lara-Mejia, 482 F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting United States v. Calandra, 414 U.S. 338, 347 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" Id. "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" Id. (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the

11

burden shifts to the government to show that the search or seizure was reasonable." Id. (citation omitted). Stated otherwise, where the search or seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred and that it was supported by reasonable suspicion." U.S. v. Lowe, 791 F.3d 424, 432 n. 4 (3d Cir. 2015). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011).

**IV.　DISCUSSION**

This court has jurisdiction over defendants' motions to suppress evidence under 18 U.S.C. §3231. A criminal defendant brings a pre-trial motion to suppress evidence under Fed.R.Crim.P. 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015).

Both defendants move to suppress the seized drug evidence found in the vehicle from the consented search. They both essentially argue that Trooper Sterniak could have completed the mission of the traffic stop sooner and, that the troopers strayed from the lawful traffic stop, which constituted an unlawful extension of the traffic stop.

Defendants attempt to present an argument that the traffic stop was a thinly veiled attempt to pull over the defendants. However, the evidence presented is to the contrary. Trooper Sterniak saw a vehicle traveling

significantly below the speed limit on the highway, which resulted in him pulling out from his stationary position. After pulling out and catching up to the vehicle, he noticed there was a significant windshield crack stretching almost entirely across the windshield and obstructing the driver's view in violation of 75 Pa. C.S.A. §4524 and 75 Pa. C.S.A. §4107(b)(2). The Third Circuit has clearly explained, "[T]he Supreme Court [has] established a bright-line rule that any technical violation a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) (citing Whren v. United States, 517 U.S. 806 (1996). The heart of the defendants' argument delves into whether the troopers unlawfully extended the traffic stop in order to conduct an "off-mission" drug trafficking investigation. Defendants contend that the troopers went off-mission at differing points in the traffic stop. Vazquez-Pagan contends the Rodriguez moment occurred when he was asked to step out of his vehicle after Trooper Sterniak already was in possession of his license, registration, and proof of insurance. (Doc. 43 p. 11). Perez-Rivera contends that the Rodriguez moment occurred when Trooper Sterniak stated that the failure to pull over was "OK" and would only be issuing Vazquez-Pagan a warning. (Doc. 46 p. 6).

Recently, in United States v. Hurtt, 31 F.4th 152, 158-59 (3d Cir. 2022), the Third Circuit explained:

> A traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Such a seizure does not violate the Fourth

> Amendment, however, if it is reasonable. A police officer's decision to stop a vehicle is reasonable if he or she "ha[s] probable cause to believe that a traffic violation has occurred." Any subsequent investigation "must be 'reasonably related in scope to the reasons for the stop.'" Even if an officer lawfully stops a suspect at first, "it could become 'unreasonable,' and thus violate the Constitution's proscription [against unreasonable searches and seizures], at some later time." If an extension of a stop prolongs it "beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," the resulting delay must be supported by reasonable suspicion. When reviewing an allegation that a traffic stop started out properly but later was improperly extended, we "look[] to the facts and circumstances confronting [the officer] to determine whether his or her actions during the stop were reasonable."
>
> In Rodriguez v. United States, the Supreme Court established a test for judging the lawfulness of an extension of a traffic stop. There, the Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Thus, "a seizure justified only by a police-observed traffic violation, ... 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission.'"

(internal citations omitted).

The Court in Hurtt, Id. at 159, then explained that "[a]n unreasonable extension [of a traffic stop] occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." (citation omitted). At this point, the court must conduct a two-stage inquiry: 1) "determine [if and] when the stop was 'measurably extend[ed]'"; and 2) "[a]fter determining when the stop was extended—the 'Rodriguez moment,' [] —[the court] [must] assess whether the facts available ... at that time were sufficient to establish reasonable suspicion." Id. (citation omitted).

14

Further, "[a]fter the Rodriguez moment, the court cannot consider anything "later in the stop [to] inform [its] reasonable suspicion analysis." Id. (citation omitted). Thus, the court "ask[s] whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality", and "[a]ny break in that mission taints the stop because it is the result of an unreasonable delay." Id. (citation omitted).

Additionally, "'unrelated inquiries' resulting in even a *de minimis* extension [of a traffic stop] are unlawful if not supported by reasonable suspicion", and "[d]etermining the 'relatedness' of any given action to the basic mission of investigating a traffic violation requires assessing whether the action was something ordinarily incident to a traffic stop. Id. at 160 (internal citations omitted). Actions normally related to the mission of a traffic stop, include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. 160 (internal citations omitted). Further, when conducting on-mission tasks, "[o]fficers should be reasonably diligent," and "the best indication of whether an officer has been reasonably diligent is by noting what the officer actually did and how he [or she] did it." Id. at 160 (internal quotations and citation omitted).

In viewing all of the facts and circumstances confronting the troopers in this case, the court finds that their initial traffic stop and investigation into the traffic violations were lawful. Assuming the defendants' identification of

the Rodriguez moment is the instant Vazquez-Pagan stepped out of his vehicle, the trooper had reasonable suspicion of criminal activity.

The Supreme Court has rejected a "divide-and-conquer analysis" and embraced a "totality of the circumstances approach." United States v. Arvizu, 534 U.S. 266, 274 (2002). This approach entails that "the whole picture … must be taken into account." United States v. Cortez, 449 U.S. 411, 417 (1981).

The majority of the circumstances here, taken as a whole, raise reasonable suspicion of criminal activity. Trooper Sterniak left his stationary position upon noticing a vehicle traveling on Interstate 380 at a much slower rate of speed than the posted speed limit of 70 m.p.h. Trooper Sterniak stated that Interstate 380 is a known "drug corridor." (Doc. 43-3 p. 1). Trooper Sterniak noted that the vehicle did not possess any dealership markings or personal markings, such as a license plate bracket, stickers, or magnets. (Doc. 51 p. 24). Trooper Sterniak, from his training and experience, stated this type of "plain jane" vehicle is typically used by drug smugglers to blend in with the general motoring public. (Doc. 51 p. 24-25).[3] While following the vehicle, Trooper Sterniak conducted a query of the vehicle's New Jersey registration and learned that the vehicle was registered out of Passaic, New

---

[3] The court gives these factors concerning the "plain Jane" appearance of the vehicle virtually no weight, as they plausibly fit the vast majority of vehicles on the road. In this court's opinion, the inclusion of such boilerplate assumptions only tend to diminish the credibility of the government's other arguments.

16

Jersey, which the government alleges is a known source of narcotics. (Doc. 51 p. 25). After Trooper Sterniak left his stationary position and caught up to the vehicle, he noticed a crack across the windshield in violation of 75 Pa. C.S.A. §4524 and 75 Pa. C.S.A. §4107(b)(2). Trooper Sterniak then turned on his emergency lights to initiate a traffic stop. While following the defendants' vehicle for approximately four miles, the MVR showcases the several occasions the sirens were activated and even where a civilian vehicle attempted to assist the troopers in pulling over the Galant. While following the defendants' vehicle, the troopers stated on multiple occasions how the driver and passenger were moving around quite a bit. (MVR 5:57, 6:10, & 6:33). It took a second patrol vehicle pulling alongside the defendants' to finally get them to pull over. From the point Trooper Sterniak activated his emergency lights until the defendants pulled over, they covered approximately four miles and required a second trooper vehicle to assist. Even after the vehicle pulled over and came to a stop, the defendants continued to move around inside the vehicle.

The Third Circuit has explained that "The Supreme Court has held [] that flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion." United States v. Bonner, 363 F.3d 213, 217 (3d Cir. 2004) (citing Illinois v. Wardlow, 528 U.S. 119, 125-26 (2000). Although Vazquez-Pagan contends he did not think the flashing lights were for him. This is not a credible argument given that he did notice the flashing lights and sirens. A civilian vehicle attempted to assist police and the

defendant passed this vehicle. The patrol vehicles followed the defendant change lanes with flashing lights. The defendants failed to pull over for four miles and were moving around inside the vehicle even up to the point they were stationary and officers were approaching.

Before the troopers ever asked for the defendant to exit the vehicle, the totality of the circumstances give rise to a reasonable suspicion of criminal activity. Despite the fact that there could be a reasonable argument that the Rodriquez moment did not occur until much later, it need not be discussed here as reasonable suspicion existed at the time argued by the defendants.

Finally, as the defendants do not challenge the signing of the consent to search form, the court need not address it either.

## V.  CONCLUSION

Based on the foregoing, including the briefing of the parties and the courts review of the audio/video dash-cam recordings, the court finds that the troopers possessed reasonable suspicion given the totality of the circumstances surrounding the pulling over of the defendants. Therefore, the court will **DENY** the defendants' motions to suppress evidence, **(Docs. 42 & 45)** without the need to hold an evidentiary hearing.

An appropriate order will be issued.

　　　　　　　　　　　　　　　　　*s/ Malachy E. Mannion*
　　　　　　　　　　　　　　　　　**MALACHY E. MANNION**
　　　　　　　　　　　　　　　　　**United States District Judge**

**DATE: December 27, 2022**
21-170-01